Filed 7/28/26  P. v. Allen CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SCOTT LEE ALLEN,<br><br>    Defendant and Appellant. | F088796<br><br>(Super. Ct. No. MCR079666)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Charlotte Woodfork and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant Scott Lee Allen guilty of second degree murder of his girlfriend. He was sentenced to 30 years to life in prison.

On appeal, Allen contends the trial court prejudicially erred by denying his request to recall the prosecution's expert witness in forensic pathology, violating his constitutional rights to present a defense and cross-examine a witness. He also argues the court abused its discretion by admitting evidence of two prior domestic violence convictions. We reject Allen's contentions and affirm the judgment.

## PROCEDURAL BACKGROUND

On May 20, 2024, the Madera County District Attorney filed an information charging Allen with murder (Pen. Code, § 187, subd. (a), count 1).[1] As to count 1, the information also alleged that Allen had suffered a prior serious felony conviction (§§ 667, subd. (a)(1), 245, subd. (a)(1)), which also qualified as a prior strike conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

On August 21, 2024, a jury found Allen guilty of second degree murder, but not guilty of first degree murder. On the same day, at a bifurcated proceeding, the trial court found true that Allen had suffered a prior serious felony conviction (§ 245, subd. (a)(1)).[2]

On October 14, 2024, the trial court sentenced Allen to an indeterminate term of 30 years to life as follows: on count 1, 15 years to life, doubled pursuant to the Three Strikes law, plus five years for the prior serious felony enhancement, stayed pursuant to section 654.[3]

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     Allen agreed to waive his right to a jury trial on his prior conviction allegations.

[3]     The trial court declined to strike Allen's prior strike conviction under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

2.

## FACTUAL BACKGROUND

### I.  The Prosecution's Case-in-Chief

In December 2023,[4] M.B. and Allen were in a dating relationship and lived together in a trailer.  M.B.'s cousin, E.M., lived in her car near M.B.'s trailer.

On December 14, at about 10:30 a.m., E.M. saw M.B. sitting on the steps of her trailer.  E.M. noticed that M.B. appeared weak, upset, and was crying.  M.B. also appeared sick, clammy, and "paler than normal."  M.B. talked to E.M. for about five minutes and told E.M. she was hungry.  Allen was inside their trailer at the time.

E.M. left and went to another trailer to heat up water for an "instant noodles" soup she was going to give M.B.  After the soup was made, E.M. walked back towards M.B.'s trailer but saw the door was shut.  She stopped and talked to friends nearby for about 10 minutes.  Then, E.M. saw Allen exit his trailer and point to a firetruck.  He asked E.M. to summon it.  E.M. directed the firetruck to Allen and M.B.'s trailer.  Allen went inside.  E.M. followed and saw M.B. lying on the floor unconscious.

Paramedics arrived at the trailer park at about 1:30 p.m. on the afternoon of December 14.  They found M.B. inside her trailer "slumped over" on the ground, undressed, and unconscious.  There was vomit on the side of M.B.'s mouth and on her shirt.  She was taken to the hospital.  On the way, one of the paramedics noticed injuries to M.B.'s hip and lower lip, and her jaw was clenched.

M.B. arrived at the hospital at about 2:15 p.m. and was provided with "life-saving measures."  She was unresponsive and had facial swelling, and multiple cuts and bruises on her face.  At about 5:00 p.m., a nurse called law enforcement at the direction of a doctor at the hospital.

Sheriff's Deputy Brandon Smith arrived at the hospital at about 5:45 p.m.  Smith observed M.B. while she was intubated and sedated in the emergency room.  Smith also

---

[4]    Undesignated dates are in the year 2023 unless otherwise specified.

3.

saw M.B.'s injuries, which included a swollen lip and chin, "red marks" on the left side of her face, and a bruise to her left eye. Smith reported back to Sergeant Charlie Robertson regarding what he observed in the hospital. Robertson drove to Allen's trailer to talk to him at about 6:00 p.m. When Robertson contacted Allen, he noticed Allen's hand had a scab and dried blood on it.

Detective Stanley Prince arrived at the hospital around 10:00 p.m. while M.B. was in the emergency room. Prince stayed until the early hours of the next morning and spoke to M.B.'s family members, however, Allen never came to the hospital.

Later, E.M. was with a neighbor when she saw Allen cleaning the inside of his trailer. At about 9:00 p.m., E.M. saw Allen leave and get into a sport utility vehicle carrying a "black duffle bag."

P.M., a close friend of Allen, received a call that M.B. was in the hospital. P.M. went to Allen's trailer to talk to him. Allen told P.M. that M.B. was in the hospital because she "wouldn't shut the f*** up." Allen also told P.M. that he slapped M.B. and she must have fallen and hit her head. Allen appeared worried.

On December 15, at about 7:00 a.m., police officers went to Allen's trailer. Allen did not answer their repeated knocks, so they broke down the door and detained him.

**Prior Uncharged Acts of Domestic Violence**

Five witnesses testified at trial regarding Allen's past acts of domestic violence. E.M. witnessed several disagreements between M.B. and Allen prior to December 14. On one occasion, while Allen, E.M. and M.B. played dice, Allen lifted his hand and "smacked [M.B.] across the mouth." M.B. appeared shocked after Allen hit her, and he seemed angry. E.M. also saw physical injuries on M.B. approximately three different times. On another occasion, E.M. saw M.B. with two black eyes. On two other occasions, E.M. saw bruises on M.B.'s arm and lower face. The bruises on M.B.'s arm were consistent with hand marks like she had been grabbed.

4.

J.H. was a friend of M.B.'s for 20 years and a foster parent to M.B.'s daughters. J.H. observed injuries on M.B. while she was dating Allen. One time at night, J.H. saw M.B. limping from behind the dumpster of an apartment complex. M.B. approached J.H.'s car and put her head into the car. J.H. observed a bruise on her jaw and "knuckle marks." On another occasion, J.H. saw M.B.'s stomach was bruised. When the pair arrived at M.B.'s trailer, Allen approached them and said, " 'What are you doing here, b****?' " M.B. told Allen that she lived there too. Allen then stated, " 'You need to leave, b****, or I'm going to f***ing kill you.' " M.B. walked into the trailer. Allen started up his lawn mower and threw gravel at J.H.'s car so she left.

M.B.'s daughter, A.C., saw an argument between M.B. and Allen in their trailer about a year prior to M.B.'s death. On that occasion, A.C. initially got into an argument with Allen. However, once M.B. got involved, the argument turned into a confrontation between M.B. and Allen. Allen told M.B., " 'Shut the f*** up, [M.B.], or I'll kill you.' " M.B.'s face became pale, and she left with A.C.

A.C. never saw Allen physically assault M.B. However, while M.B. lived with Allen, A.C. saw M.B. with two black eyes on several occasions, stab wounds to her lower bicep area of both arms, pellet wounds to her legs, bruising along her jawline, bloody wounds to her neck, a "busted" forehead, and bumps on her head.

M.B.'s niece, A.G., recalled two incidents involving arguments between M.B. and Allen. The first time, A.G. saw Allen raise his hands like he was going to hit M.B., but he stopped when he saw A.G. watching. Thereafter, M.B. was "crying and scared" because Allen told her that if she did not " 'shut the f*** up' " he would beat her up. A.G. also saw M.B. with a black eye approximately one and a half weeks before her death.

M.B.'s aunt, C.E., witnessed an argument between Allen and M.B. in their trailer. Allen told M.B. to "shut up" or he would hit her. When M.B. continued talking, Allen punched M.B. in the back of the head, hitting her on the left side. After Allen struck

5.

M.B. she cried and asked C.E. to contact the police. C.E. did not contact police. C.E. observed M.B. with injuries on other occasions, including a time when C.E. saw M.B. with two black eyes and a scratch on her forehead.

## 1. Expert Testimony

Dr. S.W. Andrews[5] provided expert witness testimony in the field of forensic pathology. A forensic pathologist is a physician who is subspecialty trained in forensics to determine and interpret injuries to assist in determining the cause of death. Andrews explained that the cause of death is the disease or injury that led to physiological changes in the body that leads to death. However, the manner of death is the circumstances surrounding the death.

Andrews conducted M.B.'s autopsy on December 20. During the external examination, there were several injuries documented to M.B.'s body, including bruising on her upper left eyelid, on her left lower lip that extended down to her chin, on the inner surface of her lip, along her left jaw, on the left and right sides of her chest, on both arms, and on both thighs. M.B. also had internal injuries to her face and head.

Andrews's internal examination included the removal and examination of M.B.'s brain. The left side of M.B.'s brain had a 36 gram subdural hematoma, or blood clot, underneath the dura layer of the brain. Given M.B.'s external injuries, the subdural hematoma was consistent with trauma. The external traumatic injuries seen on M.B. were consistent with blunt impacts to the head that caused the subdural hematoma. A loss of consciousness is consistent with a subdural hematoma.

Andrews determined M.B.'s death was caused by "blunt head trauma." The manner of death was undetermined; M.B.'s injuries could have been either inflicted or accidental. M.B.'s injuries were not clear, and thus, Andrews could not opine as to

---

[5]     Throughout his opening brief Allen refers to the prosecution's forensic pathologist as "Dr. Adams." The record shows his last name is Andrews, thus, we refer to him by this name.

exactly the circumstances that led to her death.  It is not easy to recreate a scene of what happened based on an individual's observations during an autopsy.

An examination of M.B.'s organs revealed an enlarged heart and spleen, fluid-filled lungs, and cirrhotic liver.  M.B.'s enlarged heart is indicative of an individual with high blood pressure.  An individual with a cirrhotic liver tends to bruise and bleed more easily with minimal impact.  However, despite M.B.'s medical condition, the bruising on her face was consistent with blunt head trauma that led to the subdural hematoma.  Hypertension caused by high blood pressure, and diabetes caused by high blood sugar, can both affect an individual's balance.

## II.    The Defense Case-in-Chief

C.E. testified that M.B.'s "legs were always hurting her" and she walked slow. M.B. would get "diabetic ulcers" and big sores on her legs.  C.E. saw M.B. trip in the past.

J.P. was Allen's friend for several years and knew M.B. nearly her "whole life." About a year prior, J.P saw M.B. with a "knot on her head" without blood spatter.  While Allen and M.B. were living together in the trailer, J.P. saw M.B. hit her head on the refrigerator because she was upset.  J.P. never saw Allen hit M.B.

Allen testified in his own defense.  He denied "beating [M.B.] to death."  On December 14, M.B. came inside their trailer and used the bathroom because she had "messed on herself."  M.B. appeared lethargic, her demeanor was quiet and slow.  Allen was alarmed but also thought M.B. was mad at him for not going to bed with her the previous night.  M.B. then cooked Allen noodles.  While he was eating the noodles, Allen told M.B. to sit down because she looked tired.  M.B. told him that she did not want to die.  M.B. then went back into the bathroom.

Then, Allen heard and felt a "big thump" coming from the bathroom.  When Allen looked up, he saw M.B. "going backwards" over the handrail towards the front of the trailer.  Allen got up from the table and found M.B. unconscious in the bathroom.  M.B.'s

clothes were stuck in the door jamb.  Eventually, Allen was able to get M.B. moved onto the trailer floor where he sat her up.  Allen did not notice the vomit until he returned to the trailer after calling 911.

When the paramedics arrived, Allen told them M.B. "became unconscious and fell."  Allen was nervous, scared, and relieved during the incident.  He was relieved because M.B. was sick, needed a lot of help, and he "got tired of helping her."  Later that day, Allen cleaned up the vomit and tidied up the trailer.  He placed M.B.'s soiled clothing in an ice chest.  Allen also fixed a broken wall inside the trailer.  When law enforcement came to the trailer the next day, Allen heard the knock but "went back to sleep."

Allen denied telling P.M. that he hit M.B. on December 14.  However, he admitted he hit M.B. on the head on a prior occasion when C.E. was at the trailer.  He also slapped M.B. in front of E.M.

Since Allen and M.B. began living together in March 2018, M.B.'s mobility became increasingly worse.  In the two weeks leading up to M.B.'s death, Allen saw her fall on more than one occasion.  Allen never visited M.B. in the hospital before she died.  Generally, M.B. was never quiet and Allen and M.B. got into several arguments; at times he physically struck her.  Nonetheless, Allen was not afraid of M.B.

## DISCUSSION

### I.    Denial of Request to Recall a Witness

Allen contends the trial court prejudicially impacted his right to confront and cross-examine the witnesses against him when it denied his request to recall Andrews to testify regarding M.B.'s diabetic condition.  He argues his constitutional rights under the Sixth and Fourteenth Amendments were violated by the court's ruling, which deprived him of the ability to fully present his defense to the jury.  The People maintain the court properly exercised its discretion in denying recall, and regardless, Allen failed to demonstrate prejudicial error even if abuse occurred.  We agree with the People.

## A. Additional Background

### 1. Trial Testimony

Andrews testified on behalf of the prosecution and was cross-examined by defense counsel. Andrews determined M.B.'s cause of death to be "blunt head trauma" but could not opine as to the circumstances that caused the injury. There was nothing that indicated M.B.'s injuries were inflicted; however, Andrews also could not determine if she fell. Andrews was unable to determine how the injuries were caused and could not preclude or confirm whether the injuries were caused by a fall, a fist, or weapon. Andrews testified on cross-examination that M.B.'s hypertension and diabetes could have caused her to become dizzy and fall.

Allen testified on behalf of himself. Allen stated that M.B. told him prior to falling that she "did [not] want to die."

### 2. The Parties' Arguments

After Allen testified, defense counsel requested recall of Andrews regarding M.B.'s diabetic condition and how it may have caused her to lose consciousness and fall, consistent with Allen's testimony. Defense counsel argued E.M.'s testimony also supported recall, which showed M.B. had a diabetic episode.

The prosecutor pointed out that while M.B. was in the ambulance on the way to the hospital, her blood sugar was in the "range of normal." However, there was no evidence showing M.B.'s exact blood sugar level on the day of the incident.

Upon defense counsel's request, the trial court granted him a telephone conversation with Andrews to explore M.B.'s diabetic condition. Thereafter, defense counsel renewed his request to recall Andrews. He argued that Andrews would be able to opine in more detail regarding M.B.'s diabetic condition, and specifically, whether E.M.'s testimony regarding how M.B. appeared lethargic, pale, and hungry on the day of the incident was consistent with an individual having a diabetic episode. Defense counsel also wanted Andrews to comment on Allen's testimony regarding M.B.'s "feelings of

9.

impending doom." Defense counsel contended additional testimony from Andrews was relevant to the defense theory that M.B.'s death was caused by a fall due to her diabetic condition.

The prosecutor again objected on the grounds that the proposed subject matter was speculative, not supported by evidence, and would cause confusion and delay. The prosecutor also noted Andrews's training and experience did not involve analysis of diabetic conditions and he was extensively cross-examined by defense counsel.

### 3. *The Trial Court's Ruling*

The trial court denied defense counsel's request, finding "minimal" value in recalling Andrews. The court reasoned that E.M.'s observations were in the record before Andrews testified and could have been addressed on cross-examination. The court also noted that Andrews testified that the physical conditions from which M.B. suffered, including hypertension and diabetes, can cause dizziness. Thus, the jury heard expert testimony that supported Allen's theory that M.B.'s diabetes caused her to collapse.

## B. Legal Standard

Evidence Code section 774 provides that "[a] witness once examined cannot be reexamined as to the same matter without leave of the court, but he may be reexamined as to any new matter upon which he has been examined by another party to the action. Leave may be granted or withheld in the court's discretion." A court may permit a witness to be recalled when recalling would clarify inconsistencies in the witness's testimony. (*People v. Thomas* (1992) 2 Cal.4th 489, 542.) However, if further examination "would necessarily be cumulative and repetitious of matters already inquired into," a court may refuse to allow recall. (*People v. Flynn* (1958) 166 Cal.App.2d 501, 512.)

We review a trial court's decision declining to allow recall of a witness for abuse of discretion. (*People v. Thomas*, *supra*, 2 Cal.4th at p. 542.) "[W]here a trial court has discretionary power to decide an issue, a reviewing court will not disturb that decision

10.

unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." (*Adoption of D.S.C.* (1979) 93 Cal.App.3d 14, 24–25.)

### C. No Abuse of Discretion in Refusing to Allow Recall

The trial court did not abuse its discretion when it refused to allow defense counsel to recall Andrews. Defense counsel had the opportunity to cross-examine Andrews regarding E.M.'s testimony and M.B.'s medical and diabetic conditions. When asked if M.B. had a medical condition that would impair her "ability to balance," Andrews responded: "If there—if an individual's blood pressure is too high, you can get dizzy and certainly fall. [¶] Based on the medical records, there was a history of diabetes. High blood sugar can cause dizziness. There were factors, yes." The areas of additional questioning according to the offer of proof were, at best, cumulative to defense counsel's prior questioning. Allen offered no explanation as to why the additional areas of inquiry were not adequately explored during defense counsel's extensive cross-examination of Andrews.

Moreover, Andrews's opinion regarding whether M.B. fell because she harbored feelings of "impending doom" was irrelevant and speculative (see Evid. Code, §§ 774, 350). Andrews testified he did not know the exact circumstances that led to M.B.'s death. Thus, the trial court's decision to deny Allen's request was well within the boundaries of its discretion in controlling the presentation of evidence at trial. (Pen. Code, § 1044 ["It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved"].)

Allen argues that the trial court erred by not providing the statutory authority that it was relying on when it denied his request. Allen further contends the court erred when

11.

it excluded the testimony under Evidence Code section 352 because it did not discuss potential prejudice or undue time consumption. We disagree.

Any erroneous reasoning of the trial court in reaching the correct ruling at a hearing regarding the admissibility of evidence does not warrant reversal on appeal. (See *People v. Turner* (2020) 10 Cal.5th 786, 807 [we "review the trial court's *ruling*, not its reasoning"]; see also *People v. Dickens* (2005) 130 Cal.App.4th 1245, 1254.) The court also acted within its discretion under Evidence Code section 352 to exclude marginally relevant testimony, cumulative to the testimony already produced, which was likely to necessitate undue consumption of time. (*Kessler v. Gray* (1978) 77 Cal.App.3d 284, 291 ["reasonable exercise of trial court discretion pursuant to Evidence Code section 352 requires that the trial judge balance the probative value of the offered evidence against its potential of prejudice, undue consumption of time, and confusion"].) Defense counsel told the court he wanted to recall Andrews to ask additional questions regarding M.B.'s diabetic condition and her feelings of doom on the day of the incident. The court reasonably concluded that this topic was already extensively discussed and not sufficiently significant to justify recalling him. This ruling was not error. (Evid. Code, §§ 350, 352.)

Allen recognizes his motion for recall was not a request to reopen because Andrews was not excused. (See Evid. Code, § 778 [once a witness has been excused in the action, he cannot be recalled without leave of court].) Nonetheless, Allen contends we should use the factors for analyzing a request to reopen here. Evidence Code section 778 limits the ability to recall a witness by vesting the trial court with the discretion to allow recall or not, and thus, the analysis is the same. The issue in this case is why the court refused the request. The court found Allen had ample opportunity to present and elicit evidence regarding M.B.'s diabetic condition, and further questioning regarding the topic added little value to his case.

In sum, the trial court did not abuse its discretion in denying defense counsel's request to recall Andrews because (1) he had ample opportunity to cross-examine Andrews regarding M.B.'s diabetic condition; (2) further examination "would necessarily be cumulative and repetitious of matters already inquired into" (*People v. Flynn*, *supra*, 166 Cal.App.2d at p. 512); and (3) defense counsel's offer of proof was highly speculative and irrelevant.

**D. The Trial Court Did Not Violate Allen's Constitutional Right to Confront Adverse Witnesses Nor Is There Prejudice On This Record**

A criminal defendant is guaranteed the right to confront the prosecution's witnesses under both the federal and state Constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; see *Crane v. Kentucky* (1986) 476 U.S. 683, 690.) The right, however, is not absolute. (See, e.g., *People v. Gray* (2023) 15 Cal.5th 152, 173; see also *People v. Williams* (2008) 43 Cal.4th 584, 618.) " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' " (*People v. Jones* (1998) 17 Cal.4th 279, 305.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836, and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman v. California* (1967) 386 U.S. 18, 24)." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

Considering our conclusion the trial court did not abuse its discretion, we further conclude that the court's refusal to allow the additional examination of Andrews did not violate Allen's constitutional right to confront adverse witnesses. (See, e.g., *People v. Quartermain* (1997) 16 Cal.4th 600, 623 ["notwithstanding the confrontation clause, a trial court may restrict" examination of witnesses on the grounds stated in Evidence Code section 352]; see also *People v. Jones*, *supra*, 17 Cal.4th at p. 305.) Allen was not precluded from trying to prove the cause of M.B.'s death was a fall due to her diabetic condition. Rather, defense counsel was precluded from attempting to prove it through cumulative, speculative testimony that was not particularly probative.

Even if we presume the trial court erred in denying Allen's request to recall Andrews as a witness, the denial could not possibly have affected the outcome. Defense counsel cross-examined Andrews regarding M.B.'s medical conditions, and the likelihood that those conditions may have caused her to fall. Both E.M. and Allen testified regarding M.B.'s physical appearance and feelings on the day of the incident, which defense counsel urged was consistent with a diabetic episode. As Allen concedes on appeal, defense counsel argued extensively to the jury that M.B.'s cause of death was from an accidental fall. We also point out that there was other significant evidence that was not consistent with M.B. suffering from a fall. This included P.M.'s testimony, the testimony from witnesses revealing turmoil and domestic violence in M.B.'s and Allen's relationship, and Allen's actions after the incident occurred.

Thus, the evidence was more than sufficient to lead a reasonable jury to convict Allen. Under any standard of review, the evidentiary ruling was harmless. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## II. Prior Convictions Admitted Pursuant to Evidence Code Section 1109

Allen argues the trial court abused its discretion when it admitted evidence of his prior domestic violence convictions under Evidence Code section 1109. He contends the

evidence should have been excluded under Evidence Code section 352, and the court's error requires reversal. The People respond that the court properly exercised its discretion when it admitted Allen's prior convictions because they were highly probative of his propensity to commit the current crime, and notwithstanding, any error was harmless. We agree with the People.

## A. Additional Background

Prior to trial, the parties filed competing motions in limine regarding Allen's prior domestic violence convictions (§ 273.5, subd. (a)) in 2007 and 2012 and prior uncharged acts of domestic violence against M.B.

At the Evidence Code section 402 hearing on the motions, the trial court heard testimony from five witnesses.[6] After the witnesses' testimony, the prosecutor asked to admit Allen's 2007 felony and 2012 misdemeanor convictions. He argued that while they were more than 10 years old, the convictions were admissible in the interest of justice because there is a "clear pattern" of domestic violence. The prosecutor noted that he did not intend to introduce the facts underlying the convictions. The prosecutor further argued the witnesses' testimony should be admissible because it is direct evidence of prior domestic violence.

Defense counsel opposed the request because of the age gap between Allen's prior convictions and the current offense, and the fact that the convictions were against a different victim. Defense counsel also opposed introducing testimony from the witnesses regarding the prior uncharged acts of domestic violence against M.B. on the grounds that it was speculative, not relevant, and would confuse the jury.

The trial court found Allen's two prior domestic violence convictions admissible. The court also concluded that the five witnesses were able to testify at trial regarding

---

[6] The five witnesses who testified at the hearing regarding M.B. and Allen's relationship were as follows: E.M., J.H., A.C., A.G., and C.E. These were the same witnesses who testified at trial as set forth above.

15.

Allen's past acts of domestic violence against M.B.  The court's reasoning, in full, is as follows:

> "The two incidents which led to [Allen's] prior domestic violence convictions are similar to the circumstances of the present matter .…  Each case involved [Allen] becoming frustrated with different domestic partners and striking … the partners.…  In the instant matter, [Allen] indicated … that [M.B.] 'just wouldn't shut up,' implying that this was the cause of her injury.

> "Each of these incidents suggest[s] that [Allen] has a difficult time coping with and addressing interpersonal conflict between himself and his intimate partners without resorting to violence.  Evidence of each of these … assaults came from … different sources … eliminating the possibility of fabrication.  Because the 2007 and 2012 assaults resulted in criminal convictions[,] it is unlikely that [Allen] could produce evidence to rebut the testimony of witnesses to those prior incidents.  This reduces potential unfairness ….

> "Because each of the incidents is separated in time and involve[s] different victims and witnesses, it is unlikely that the evidence of the earlier convictions would unduly confuse the jury.  The presentation of evidence of the prior uncharged acts will not consume an unreasonable amount of time as the [prosecution] intend[s] to offer [Allen]'s records of conviction in those matters as the only evidence.

> "While evidence of the prior acts may be inflammatory, the injuries suffered by the victims were relatively minor.  The 2012 incident resulted in a misdemeanor conviction.…  [I]t cannot be disputed that the past conduct is less egregious and inflammatory than the conduct involved in the present matter which is alleged to have resulted in [M.B.'s] death.

> "The remoteness of the prior uncharged acts, occurring 11 and 16 years prior to the instant matter, is certainly a factor to consider in evaluating the probative value of the evidence of those earlier acts.  The remote nature of a prior conviction becomes more significant when it is followed by a period during which the convicted person refrains from committing additional acts of domestic violence.  The significance of the passage of time wains … when, as here, a person continues to assault his intimate partners.  Still, subdivision (e) of [Evidence Code] [s]ection 1109 requires that evidence of acts, including convictions, occurring more than 10 years before the charged offense [is] inadmissible absent a specific finding that the interest of justice demands [its] admission.

16.

"[T]here is evidence of ongoing domestic violence perpetrated by [Allen] against [M.B.] The evidence … [of] violence was in the form of actual physical abuse such as [Allen] slapping [M.B.], striking her in the mouth with the back of his hand and punching her in the temple with his fist. Each of the witnesses …, with the exception of [E.M.], testified to observing injuries to [M.B.] that are consistent with those sustained during incidents of domestic violence. Each of the witnesses … testified that they personally, on different occasions, heard [Allen] threaten to kill [M.B.] The credibility of these threats and the reasonableness of [M.B.]'s apprehension that the threats would result in imminent bodily injury is amplified by the times when [Allen] … struck her.

"The evidence received … suggests that [Allen] has failed to reevaluate and alter his conduct toward his domestic partners following his 2007 and 2012 convictions. To exclude evidence of the prior convictions and the prior acts of domestic violence by [Allen] against [M.B.] would, in substance, permit [Allen] to represent to the jury that his admission to slapping [M.B.] one or two days before her death was an isolated incident and not part of a much longer history of domestic violence perpetrated by [Allen] against his domestic partners. It is clear to the court that this would be a misrepresentation and would mislead the jury. Accordingly, the court finds that it is in the interest of justice, within the meaning of [Evidence Code] [s]ection 1109[, subdivision ](e), to permit the [prosecution] to present evidence of [Allen]'s 2007 and 2012 convictions for violations of … section 273.5[, subdivision ](a), as well as the testimony of witness[es] who observed past acts of domestic violence committed by [Allen] against [M.B.]"

The parties stipulated Allen was convicted of felony domestic violence in 2007, and misdemeanor domestic violence in 2012. No facts underlying these convictions were admitted into evidence.

The five witnesses testified as described above, and no further objections were made as to the admissibility of their testimony under Evidence Code section 1109 at trial.

## B. Relevant Law and Standard of Review

Evidence of a defendant's conduct is generally inadmissible when offered to prove his or her conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) However, Evidence Code section 1109 creates an exception to this rule in cases involving domestic violence, which allows admission of evidence of the defendant's commission of other

17.

domestic violence to show he has a propensity to commit such offenses.[7]  (Evid. Code, § 1109, subd. (a)(1); see *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.)  The statute reflects the Legislative intent that in domestic violence cases, prior offenses are uniquely probative of a defendant's guilt on a later occasion.  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 532 (*Johnson*).)  "The admission of prior acts as propensity evidence encompasses both charged and uncharged acts."  (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233 (*Brown*).)

Admissible evidence under Evidence Code section 1109 is nonetheless still subject to the weighing process under Evidence Code section 352, which "makes evidence of past domestic violence inadmissible only if the court determines that its probative value is 'substantially outweighed' by its prejudicial impact."[8]  (*Johnson*, *supra*, 185 Cal.App.4th at p. 531; Evid. Code, § 1109, subd. (a)(1).)  "The prejudice that [Evidence Code] section 352 is designed to avoid is not the damage that naturally results from highly probative evidence, but rather the prospect of leading the jury to prejudge a person or focus on extraneous factors."  (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1192.)

Moreover, subdivision (e) of Evidence Code section 1109 contains an exception to subdivision (a)'s rule of admissibility.  Under subdivision (e), evidence of domestic violence occurring more than 10 years before the charged offense is inadmissible, "unless the court determines that the admission of this evidence is in the *interest of justice*."  (*Id*.,

---

[7]     Evidence Code section 1109, subdivision (a)(1) provides:  "Except as provided in subdivision (e) …, in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] [s]ection 1101 if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352."

[8]     Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

at subd. (e); italics added.) "Thus, while evidence of past domestic violence is presumptively admissible under subdivision (a)(1), subdivision (e) establishes the opposite presumption with respect to acts more than 10 years past." (*Johnson*, *supra*, 185 Cal.App.4th at p. 537, fn. omitted.) Subdivision (e) does not prohibit evidence of such remote acts, rather it "clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an 'interest of justice' standard." (*Johnson*, at p. 539.) The inquiry is similar to the inquiry under Evidence Code section 352, and "the 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission … and concludes … that the evidence was 'more probative than prejudicial.' " (*Johnson*, at pp. 539–540.)

The trial court has broad discretion to weigh the relevant factors because it is in the best position to evaluate the evidence. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917–918.) "[T]he court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*Brown*, *supra*, 192 Cal.App.4th at p. 1233.)

## C. Analysis

Allen claims evidence regarding his prior convictions for domestic violence should have been excluded pursuant to Evidence Code section 352 because the evidence was cumulative to the witnesses' testimony regarding domestic violence and remote. Thus, according to Allen, evidence of his prior convictions was more prejudicial than probative.

We first turn to the probative value of the prior convictions. " ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' " (*Johnson*, *supra*, 185 Cal.App.4th at p. 531.) By enacting Evidence Code section 1109, the Legislature intended to make a prior incident admissible that is " 'similar in character to the charged domestic violence crime, and which was committed

19.

against the victim of the charged crime or another similarly situated person.' (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, p. 5.)" (*Johnson*, at p. 532.)

Both the prior convictions and the circumstances in this case began during an argument between Allen and his domestic partner. In the prior incidents, Allen struck the different victims because he was upset. In the instant case, the evidence showed that Allen was physically violent toward M.B. because she would not be quiet. Weighing in favor of admissibility, the trial court found that the prior domestic violence convictions were like the circumstances in the instant case because they both showed Allen struggled with addressing interpersonal conflict with his domestic partners without resorting to violence.

The trial court also found the evidence of the prior convictions would not confuse or mislead the jury, particularly because the 2007 and 2012 convictions involved different victims and were separated by time. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 404–405 [the probative value of uncharged conduct increased where independent evidence of additional instances of similar misconduct committed pursuant to a common design or plan were produced].)

The probative value of the evidence of the 2007 and 2012 convictions was not "substantially outweighed" by its prejudicial effect. (Evid. Code, § 352.) The primary factors affecting the prejudicial effect of uncharged acts are whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses, and whether the uncharged acts resulted in criminal convictions, thus minimizing the risk the jury would be motivated to punish the defendant for the uncharged offense. (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405.) As the court noted, the evidence in the prior convictions was far less inflammatory than the circumstances in the current case. The evidence that Allen stuck his domestic partners in 2007 and 2012 was very unlikely to have a significant impact compared to the evidence here, which

resulted in serious physical injuries and death. (See, e.g., *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1097.)

Nor do we believe that any motivation to punish Allen for the prior convictions was a substantial issue. The parties stipulated Allen suffered a felony conviction in 2007 and a misdemeanor conviction in 2012 for domestic violence, and the jury could infer that Allen was punished accordingly.[9] (*People v. Falsetta, supra*, 21 Cal.4th at p. 917 ["the prejudicial impact of the evidence is reduced if the uncharged offenses resulted in actual *convictions* and a prison term"].) The underlying facts related to those convictions were not offered by the prosecutor, thus preventing confusion. Likewise, the court found presentation of the evidence would not consume an inordinate time because it was offered by stipulation, which took up one page of transcript.

The crux of Allen's argument is that the prior convictions were too remote to be probative of his disposition to engage in current domestic violence. However, subdivision (e) of Evidence Code section 1109 "sets a threshold of presumed inadmissibility, not the outer limit of admissibility." (*Johnson, supra*, 185 Cal.App.4th at p. 539.) There is no specific time limit for establishing when a prior offense is so remote as to be deemed inadmissible. (*People v. Pierce* (2002) 104 Cal.App.4th 893, 900.) The prior convictions here occurred approximately 12 and 17 years before trial, which is not per se remote. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 284 (*Branch*) [evidence of a prior sex offense that was 30 years old was properly admitted].)

We acknowledge that a substantial gap between the prior acts and the charged offense is, in theory, less probative that the defendant was predisposed to commit the current offense. (See *Branch, supra*, 91 Cal.App.4th at p. 285.) This is certainly true if

---

[9]     Specifically, the parties stipulated that Allen was "convicted of inflicting corporal injury resulting in a traumatic condition on a spouse or former spouse, cohabitant or former cohabitant, fiancé or former fiancé, or someone with whom he was involved in a dating or former dating relationship" pursuant to section 273.5, subdivision (a).

the defendant has led a "blameless life in the interim." (*People v. Harris* (1998) 60 Cal.App.4th 727, 739 [noting the " 'staleness' of an offense is generally relevant … only if the defendant has led a blameless life in the interim"].)

Allen, however, did not lead a blameless life. The five witnesses' testimony focused on Allen's prior acts of domestic violence against M.B. during the eight years they were in a dating relationship. E.M. and C.E. testified they witnessed Allen physically abuse M.B. J.H. and A.C. testified Allen threatened to kill her. These witnesses also noticed M.B. with multiple physical injuries, including bruises and stab wounds, just weeks prior to the murder.

The trial court expressly addressed the remoteness of the prior convictions, applied the presumption of inadmissibility (Evid. Code, § 1109, subd. (e)) but nonetheless concluded the probative value was high because the prior acts evidence revealed a much longer history of domestic violence perpetrated by Allen against M.B.[10] (*People v. Kerley* (2018) 23 Cal.App.5th 513, 535 (*Kerley*) [" ' "Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity" ' "].) For the reasons set forth above, we also conclude that the similarities between Allen's two prior convictions and the instant case balance out any remoteness. (*Branch*, *supra*, 91 Cal.App.4th at p. 285; *People v. Pierce*, *supra*, 104 Cal.App.4th at p. 900.) The court's reasoning was sound.

Relying on *People v. Disa* (2016) 1 Cal.App.5th 654, Allen argues that inflammatory details from the prior convictions were unduly prejudicial. In *Disa*, the defendant admitted he killed his girlfriend by putting her in a chokehold, but denied the murder was premeditated. (*Id*. at p. 657.) The defendant was convicted of premeditated first degree murder. (*Ibid*.) The trial court admitted evidence of a prior domestic

---

**10** The trial court further noted that Allen "has failed to reevaluate and alter his conduct toward his domestic partners following his 2007 and 2012 convictions."

violence incident that the court acknowledged involved " 'totally different' " acts, including a bloody knife attack on a former girlfriend that involved planning and hours of waiting. (*Id*. at pp. 671–673.) The evidence was admitted under Evidence Code section 1109 to show propensity to commit domestic violence but not premeditation and deliberation. (*Disa*, at p. 673.)

The First District found there was a "serious risk" the jury would improperly use the evidence of the defendant's past conduct, which included extensive planning and waiting, to find premeditation and deliberation in the current case. (*People v. Disa*, *supra*, 1 Cal.App.5th at p. 673.) The *Disa* court found admission of the evidence of the defendant's past conduct "was highly inflammatory and was not specifically relevant to the purpose for which the past incident of domestic violence was admitted, that is, to show a propensity to do violence to a partner or former partner." (*Id*. at p. 674.) The court further held that the admission of the prior acts prejudiced the defendant, especially because the evidence of premeditation and deliberation of the victim's killing in the charged case was underwhelming. (*Id*. at pp. 674–675.)

The facts in *Disa* are inapposite. The prior uncharged acts were less inflammatory than the charged offense. The prior domestic violence convictions pale in comparison to the murder committed here. Moreover, the evidence is directly relevant to Allen's propensity to commit violence against M.B., as well as a pattern of escalating violence. The details of Allen's prior conduct and convictions were not unduly prejudicial merely because the evidence was damaging to his case—rather the "prejudice" discussed in Evidence Code section 352 refers to evidence that "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138; see *Johnson*, *supra*, 185 Cal.App.4th at p. 534.) In applying Evidence Code section 352, the term " ' " 'prejudicial' is not synonymous with 'damaging.' " ' " (*Poplar*, at p. 1138.) "Painting a person faithfully is not, of itself, unfair." (*People v. Harris*, *supra*, 60

23.

Cal.App.4th at p. 737.) The extent of the evidence relating to Allen's prior acts of domestic violence was squarely within the trial court's " ' " ' "broad discretion" ' " ' " to admit. (See *Kerley*, *supra*, 23 Cal.App.5th at p. 532.)

Viewing the evidence in the context of the trial as a whole, including the jury instructions, witness testimony, and closing arguments, we conclude the charged offense was "the primary focus of the trial." (See *Kerley*, *supra*, 23 Cal.App.5th at p. 539 [evaluating whether the charged offense was the "primary focus" of the trial].) The stipulation relating to the prior convictions was brief. Although Allen's history of abusing M.B. was comprised of five witnesses, it only took up one half day of trial testimony and was not cumulative to the convictions, which involved different victims. A greater amount of evidence was devoted to proving M.B.'s murder. Thus, because the evidence of Allen's prior convictions was presented to the jury by stipulation, not inflammatory, and was highly probative of whether Allen had a propensity to batter his partners, the trial court did not abuse its discretion in admitting them under Evidence Code sections 352 and 1109.[11] (See *Johnson*, *supra*, 185 Cal.App.4th at pp. 539–540 ["the 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission under [Evidence Code] section 352 and concludes … that the evidence was 'more probative than prejudicial' "].)

Finally, Allen argues the trial court erred in failing to provide a definition for the term "traumatic condition" contained in CALCRIM No. 852A, and that CALCRIM

---

[11] For the same reasons, we reject Allen's argument that the admission of his two prior convictions violated his right to due process and a fair trial. "Courts have consistently rejected [the] claim … that the admission of propensity evidence under [Evidence Code] section 1109 violates due process." (*People v. Merchant*, *supra*, 40 Cal.App.5th at p. 1194; see *Brown*, *supra*, 192 Cal.App.4th at p. 1233, fn. 14 [noting numerous courts have held "the admission of evidence pursuant to [Evidence Code] section 1109 … does not violate a defendant's rights to due process"].)

No. 840 should also have been provided to the jury.[12]  Allen stipulated to his two prior convictions (§ 273.5, subd. (a)).  He further did not object to the jury instruction or otherwise direct the court to provide an alternative instruction, and this failure forfeits any state law instructional error.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)  While we may review any instruction given despite the lack of objection if the substantial rights of the defendant were affected, we see no reason to do so here, where Allen does not make such claim.[13]  (*Id*. at p. 579; § 1259.)

**D. Any Assumed Error in the Admission of Evidence was Harmless**

There is also no prejudice on this record.  Although the defense theory was that M.B. suffered an accidental fall, as we discussed above, there was strong evidence showing this was not the case.  Allen and M.B. had been domestic partners for about eight years.  He had a history of engaging in physical violence and threatening M.B.  On the day of the murder, M.B. appeared upset and wanted food.  When E.M. returned with the food, M.B. was inside her trailer with Allen.  Not long after, Allen came out and began directing emergency personnel to the trailer.  There is no denying Allen was the only person with M.B. inside the trailer at the time she suffered an impact to her head that caused her death.  Moreover, Allen told P.M. that he physically abused M.B., which caused her to fall because she would not "shut … up."

Allen's testimony to the contrary is comparatively weak.  He testified M.B. simply became unconscious and fell, hitting her head.  However, he gave no explanation for the other injuries M.B. sustained on the day of the fall, including those to her hip, lower lip, and multiple cuts and bruises on her face.  Allen admitted he was physically violent

---

[12]     We point out that the jury was instructed with the term "domestic violence," which includes abuse against a girlfriend or cohabitant.  (Evid. Code, § 1109, subd. (d)(3); Pen. Code, § 13700, subd. (b).)

[13]     Allen's claim is insufficiently developed and lacks legal authority. Thus, we also reject his argument on these alternative grounds.  (See *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2; *People v. Hardy* (1992) 2 Cal.4th 86, 150.)

towards M.B. and was "relieved" during the incident because he was tired of helping her. Based on his own testimony, it would not be unreasonable for a jury to perceive that Allen's behavior was inconsistent with his account of M.B.'s demise. He never visited M.B. in the hospital or checked on her welfare. He also cleaned up the trailer after the incident and gave an absurd explanation as to why law enforcement had to break down his door to detain him. Considering the foregoing evidence, the defense theory that M.B. simply became unconscious and fell was implausible.

The jury was also instructed on the presumption of innocence, informed they were not required to conclude that Allen was disposed to commit domestic violence by the evidence, and cautioned not to presume Allen was a "bad person" because of the prior domestic violence. The prosecutor still bore the burden of proving each element beyond a reasonable doubt. The prosecutor did not focus on Allen's past convictions or incidents of domestic violence but emphasized the strong evidence supporting the current charges. Defense counsel also urged the jury not to convict Allen based on his prior misconduct.

There is no reasonable possibility of a verdict more favorable to Allen, even in the absence of evidence of the prior convictions. Thus, even assuming the evidence was inadmissible, the error in admitting it was harmless. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People* v. *Watson*, *supra*, 46 Cal.2d at p. 836.)

## DISPOSITION

The judgment is affirmed.

GUERRA, J.

WE CONCUR:

HILL, P. J.

LEVY, J.

26.